Christopher WEY, Plaintiff,

v.

EVANGELICAL COMMUNITY HOSPITAL, Defendant.

No. 4:CV–92–0520.

United States District Court, M.D. Pennsylvania.

Sept. 21, 1993.

Roberta Mueller, Keystone Legal Services, Inc., State College, PA, for plaintiff.

David R. Bahl, Williamsport, PA, for defendant.

### MEMORANDUM

McCLURE, District Judge.

### I. BACKGROUND:

On July 19, 1991, plaintiff Christopher Wey ("Wey" or "plaintiff") fell from his bicycle and injured his leg. He was transported by ambulance to Evangelical Community Hospital in Lewisburg, Pennsylvania ("defendant" or "the hospital"). Once there, he informed hospital personnel that he was HIV positive and that he suffered from Immune Thrombocytopenia ("ITP"), a condition which causes a lowered blood platelet count. Wey had been receiving treatment for both of these conditions from a physician at the Veterans Administration Medical Center in Wilkes–Barre, Pennsylvania ("VAMC").

At the hospital, Wey learned that he had a bimalleolar fracture and dislocation of his right ankle. The emergency room physician attempted to relieve the dislocation but was unsuccessful. He informed Wey that he was in need of surgery to relieve the condition.

At some point during the evening, a decision was made to transfer Wey to the VAMC in Wilkes–Barre. Wey was informed that the hospital did not provide an ambulance service, and that he might incur an expense in a transport by a private ambulance company, in spite of the fact that he was eligible for Medical Assistance benefits. Wey therefore was transported from defendant Evangelical Community Hospital to VAMC by private

car, his own 1980 Honda Prelude, driven by his wife. Wey was discharged from Evangelical Community Hospital at 1:25 a.m. on July 20, 1991, and arrived at VAMC at 3:05 a.m. on the same date.

Plaintiff now seeks from this court a judgment that his discharge and transfer violated the Federal Anti–Dumping Act, 42 U.S.C. §§ 1395dd, and a portion of the Public Health Service Act, 42 U.S.C. §§ 291 et seq., commonly known as the Hill–Burton Act. He also seeks $5,000.00 in general damages for his pain and suffering during the transfer, $1,000.00 for separation from his family while at VAMC, and an award of costs.

Judgment shall be entered in favor of defendant. Plaintiff's transfer violated neither the Anti–Dumping Act nor the Hill–Burton Act. Plaintiff's condition was stabilized at the defendant hospital, fulfilling its burdens under the Anti–Dumping Act. Assuming further responsibilities on the part of the hospital, the transfer was appropriate and plaintiff was provided with the opportunity to refuse to consent to the transfer. The hospital does not provide ambulances, nor can it ensure the provision of a particular ambulance, so that no service of the hospital was denied to plaintiff. Therefore, the Hill–Burton Act was not violated.

At the non-jury trial held July 6, 1993, the evidence received by the court included testimony from the plaintiff, his wife and the emergency room nurse, deposition testimony from the emergency room physician, and two expert reports, one from an infectious disease specialist and the other from an orthopaedic surgeon. On the basis of all the evidence, and on an extensive stipulation of facts, the court finds the following facts.

### II. FINDINGS OF FACT

1. The events out of which this action arises occurred during the late evening hours of July 19, 1991 and the early morning hours of July 20, 1991.

2. Plaintiff was a resident of Lewisburg, Union County, Pennsylvania on July 19, 1991 and continues to reside there.

3. Wey was born on March 6, 1958, is a high school graduate, and completed three years of college.

4. Wey is HIV positive and suffers from Immune Thrombocytopenia ("ITP"), a disease which causes him to experience low platelet count.

5. Wey, a recovering drug addict, was diagnosed as being HIV positive in 1984 and has been suffering from ITP since 1989.

6. As of July 19, 1991, Wey was receiving treatment for both these conditions at the Veterans' Administration Hospital at Wilkes Barre, Pennsylvania (VAMC) and Geisinger Medical Center in Danville, Pennsylvania.

7. As a result of his HIV positive status and his ITP, Wey's medications had included both AZT and Dapsone.

8. As of July 1991, Wey was seeing Dr. Brady, an oncologist at Geisinger Medical Center and Dr. Plotkin at the VAMC for treatment of his conditions. Wey considered Dr. Plotkin to be his treating physician at the VAMC.

9. In July 1991, Wey did not have a treating physician in Lewisburg, Pennsylvania.

10. Dr. Gordon, an infectious disease specialist at Geisinger Medical Center, had begun treating Wey with AZT in 1988. At some time prior to July 19, 1991, Wey transferred his care relative to the provision of AZT to Dr. Plotkin at the VAMC because he was dissatisfied with Dr. Gordon.

11. Wey continued to see Dr. Brady, an oncologist at Geisinger Medical Center for treatment of his ITP.

12. Based on the medical records, Wey's treatment at Geisinger Medical Center in 1991 included visits to the Hematology/Oncology Clinic in February, March and April, the Department of Psychiatry in May (twice) and the Infectious Disease Clinic in May.

13. Based on the medical records, the most recent treatments at the Infectious Disease Clinic at the VAMC prior to July 19, 1991 were as follows:

(a) On June 8, 1991, Wey was admitted for detoxification. The medical records list a history of HIV and thrombocytopenia. The blood platelet count was low and Wey received IV Gammaglobulin (IVIG) and AZT. He was discharged on July 3, 1991, after an inpatient stay of 25 days. From May 30, 1991 to July 2, 1991, Dr. Plotkin worked with Wey's ITP and Wey received treatment for his low platelets on several occasions.

(b) On July 18, 1991, Wey was seen in the VAMC Infectious Disease Clinic as an outpatient and a platelet count was ordered. Restarting his Dapsone was considered. Wey was also seen as an outpatient by the psychiatric service to help maintain his psychological stability.

14. As of the discharge from the VAMC on July 2, 1991, Dr. Plotkin had discussed with Wey the possibility of a future admission to get Wey's platelets to a satisfactory level through intravenous gammaglobulin (IVIG) therapy.

15. At his visit to the VAMC on July 19, 1991, Dr. Plotkin discussed with Mr. and Mrs. Wey the ITP and the fact that Wey might possibly still require future treatment with IVIG. Dr. Plotkin anticipated performing a complete blood analysis and workup at the VAMC.

16. At the time of his visit to VAMC on July 18, 1991, Wey was told to return to the Infectious Disease Clinic in one month.

17. Wey is a veteran and had received an honorable discharge. As of July 19, 1991, he was thus entitled to free treatment at the VAMC.

18. As of July 19, 1991, Wey was also covered by the Pennsylvania Medical Assistance program, the state version of Medicaid. As a beneficiary under this program, Wey was entitled to have his medical care paid for by the Medical Assistance program.

19. As of July 19, 1991, Wey was receiving Social Security disability benefits, but was not yet entitled to Social Security medical benefits (Medicare).

20. Defendant hospital is a non-profit corporation and a health care provider, maintains an emergency room and provides emergency medical services.

21. Defendant participates fully in both the Medical Assistance and Medicare programs.

22. On the evening of July 19, 1991, at approximately 11:00 p.m., Wey and a friend, Richard Donohue, were riding their bicycles in the Lewisburg area. Wey fell and injured his ankle.

23. A passerby reported this accident and the William Cameron Ambulance Company, a volunteer organization located in Lewisburg, responded to the location.

24. Wey was taken to the emergency room of the hospital by the ambulance from the William Cameron Ambulance Company.

25. While Wey was being transported to the Hospital, Donohue went to Wey's home to inform Mrs. Wey of what had happened. Donohue and Mrs. Wey arrived at the hospital thereafter.

26. Wey was later billed for this transportation by the William Cameron Ambulance Company. When he received the bill, he notified them that he was covered by Medical Assistance and the ambulance company then billed Medical Assistance for the services and sought no further payment from Wey.

27. Wey arrived at the emergency room of the hospital at 11:52 p.m., July 19, 1991.

28. When Wey presented at the hospital, he was screened and determined to have an emergency medical condition consisting of a bimalleolar fracture and dislocation of the right ankle as a result of the biking accident.

29. By approximately 11:55 p.m., Wey was seen by Dr. Barry Spector.

30. Dr. Spector is an employee of the hospital and was acting as the hospital's agent throughout his treatment of Wey. Dr. Spector was the emergency room physician on duty on the evening of July 19 and the morning of July 20, 1991.

31. Dr. Spector, a physician since 1979, is Board Certified in Emergency Medicine and in Pediatrics; his specialty then was the practice of Emergency Medicine.

32. Dr. Spector's duties while in the emergency room included evaluating patients seeking care through the emergency department, making decisions concerning the care needed, handling the disposition of that care, and determining whether the patient should or should not be admitted to a hospital.

33. Dr. Spector's first involvement was directly with Wey; he had no prior communication with the ambulance personnel or hospital staff, including the emergency room clerk or any emergency room triage nurse.

34. Dr. Spector determined that Wey needed immediate care and treatment in the emergency room.

35. Dr. Spector personally obtained the medical history from Wey. At the time, Wey was confused, frustrated and in pain.

36. As part of the history taking, Wey disclosed that he was HIV positive and had ITP. He made this disclosure out of concern for those treating him, and because he knew that the information was important for purposes of diagnosis and treatment.

37. During the course of this history taking, Dr. Spector became aware that Wey had been treated at the VAMC and was given Dr. Plotkin's name.

38. As part of the history taking, Dr. Spector believed that Wey was to return to the VAMC under the care of Dr. Plotkin, whom Dr. Spector knew, for a complete blood analysis relative to his ITP condition.

39. As of July 19, 1991, Dr. Spector was not aware that Wey was being treated at any facility or hospital other than the VAMC. Wey did not disclose to Dr. Spector that he had previously been treated by physicians at the Geisinger Medical Center for the HIV positive and ITP conditions.

40. Wey had never sought treatment for his HIV or ITP conditions at defendant hospital.

41. At all times during his provision of care and treatment to Wey, Dr. Spector was not aware that Wey was a Medical Assistance recipient and had no knowledge as to what third-party source of payment, if any, existed.

42. Mrs. Wey arrived at the emergency room while Wey was being seen by Dr. Spector.

43. When Mrs. Wey arrived at the emergency room, she informed the clerk of her name and address. She also presented Wey's blue medical card containing the appropriate Medical Assistance information and establishing that Wey was eligible for Medical Assistance.

44. No one at the hospital asked Wey if he had Blue Cross and Blue Shield, commercial health insurance or Medical Assistance.

45. Upon admission, there was never any conversation between Wey and any employee of the hospital about how Wey was going to pay for the services being received.

46. At no time while Wey was at the hospital on July 19 or July 20, 1991 did Dr. Spector or any nurse, clerical person or employee of the hospital ever discuss with Wey how he would make payment of the hospital bill, whether he had Blue Cross and Blue Shield, health insurance, a Medical Assistance card, or how he would pay for any contemplated future medical services dealing with the fractured ankle.

47. Any conversation regarding how Wey would pay for the emergency room services or any contemplated future medical service dealing with the fractured ankle were with Mrs. Wey.

48. The only discussion with Mrs. Wey relative to payment was the discussion with the clerk during which Mrs. Wey produced the blue medical card showing that Wey was covered by Medical Assistance.

49. Mrs. Wey was not present for Dr. Spector's initial discussion with Wey.

50. Mrs. Wey met her husband in the emergency room and spoke with Dr. Spector.

51. Mrs. Wey had just completed an eight hour shift at her place of employment, was tired, and was frustrated by the fact that her husband was hurt.

52. Donohue, Wey's friend, remained in the waiting room at the hospital.

53. At 12:05 a.m., July 20, 1991, Wey was given a shot of Demoral and was taken to the x-ray department.

54. The x-ray showed that Wey had a bimalleolar fracture and dislocation of the right ankle.

55. Wey returned from x-ray at 12:20 a.m., July 20, 1991.

56. Dr. Spector attempted to reduce the dislocation, but was unsuccessful in so doing.

57. After reviewing Wey's x-rays, Dr. Spector believed that Wey would need surgical treatment to reduce the dislocation and treat the fracture.

58. Open reduction and internal fixation of a bimalleolar fracture and dislocation is a form of inpatient hospital treatment normally covered by Medical Assistance.

59. Dr. Spector told both Mr. and Mrs. Wey that Wey would need surgery.

60. A second attempt to reduce the dislocation was offered by Dr. Spector and declined by Wey.

61. A decision was made to transfer Wey. Dr. Spector discussed the possibility of a transfer with Wey, who did not object to the transfer and indicated that he felt comfortable at VAMC.

62. Dr. Spector did not consider the HIV positive status to be of importance in the decision to transfer, but did consider the ITP to be important.

63. Any acute medical condition, i.e. the bimalleolar fracture and dislocated ankle, for which Wey needed treatment, had to be viewed and considered in the context of his medical history.

64. Dr. Spector did not order a platelet count for Wey while he was at the hospital. He reasoned that Wey had sustained a superficial abrasion, the bleeding was controlled, and there was no oozing and no expanding hematoma in the area of the fracture.

65. At 12:25 a.m. Dr. Spector splinted Wey's ankle and gave Wey one further injection of Demoral shortly before the discharge and transfer, to reduce the pain and provide additional comfort.

66. The nature of the injury to Wey's ankle was accurately diagnosed and Dr. Spector appropriately applied a sugar thong

and splint to keep the ankle totally immobile. Ice was also applied.

67. In summary, Dr. Spector examined the patient, ordered and read x-rays, administered an injection of Demoral, attempted to reduce the dislocation, suggested to Wey another attempt at reduction, splinted the ankle, applied ice and, as discussed below, called Dr. Lin for approval of the transfer.

68. Fractures of this type are normally splinted and patients are routinely discharged to return when there has been a decrease in swelling and at the time the surgical procedure, if any, is to be performed.

69. At 12:35 a.m., Dr. Spector instructed a nurse to make telephone contact with the VAMC so as to begin the process of obtaining acceptance by the transferee hospital.

70. Dr. Spector then spoke with Dr. Bali at the VAMC in Wilkes–Barre, informed Dr. Bali of the bimalleolar fracture and dislocation suffered by the plaintiff, the eventual need for surgery and, further, told Dr. Bali that Wey was HIV positive and was under the care of Dr. Plotkin for his HIV status and for the ITP.

71. Dr. Spector did not attempt to contact Dr. Plotkin.

72. Dr. Spector did not ask Dr. Bali to pull Wey's chart or records.

73. Dr. Spector verified acceptance of Wey with the VAMC and sent Wey's medical records and x-rays with Wey.

74. Dr. Bali then told Dr. Spector to inform Wey that, under VAMC guidelines, they would not pay for an ambulance.

75. Dr. Spector told Mr. and Mrs. Wey that the VAMC would not pay for an ambulance. Dr. Spector further told Wey that he could still elect to go by ambulance, but may incur an expense.

76. When a patient at the hospital needs transportation by ambulance, the normal procedure is to ask the patient if he or she has any preference for a particular company.

77. The hospital does not provide an ambulance or have an ambulance service for any patient and the ambulances used do not belong to the hospital.

78. When effectuating a transfer, if a physician determines that an ambulance is required, the procedure is for the hospital to call the 911 number. The county communications office then dispatches an ambulance based upon availability.

79. The William Cameron Ambulance Company participates in the Medical Assistance program.

80. Wey's Medical Assistance card paid for the ambulance trip from the accident site to the hospital emergency room.

81. In the course of evaluating Wey, Dr. Spector contacted Dr. Lin, the orthopedist on call, at home.

82. Should a specialist be needed to treat or care for the patient seeking emergency room treatment, the emergency room physician, according to the policy and procedure of the hospital, is to contact the appropriate specialist on call unless the patient requests a specific physician. The specialist is typically an independent contractor physician with medical staff privileges at the hospital. The specialist then provides the necessary care, treatment, or advice, if needed.

83. Dr. Spector told Dr. Lin that he was unable to reduce the dislocation and that Wey wished to be transferred to the VAMC.

84. Dr. Lin told Dr. Spector that there would be minimal or no risk involved with a transfer and that a transfer would be medically appropriate under the clinical circumstances then and there presented, including the fact that the dislocation could not be reduced.

85. Dr. Lin, an orthopedic surgeon, did not examine Wey, but opined in consultation that the transfer was medically appropriate.

86. Dr. Spector did not in this conversation discuss with Dr. Lin the means of transporting Wey.

87. At 12:40 a.m., Dr. Spector checked Wey's pedal pulse.

88. At 1:15 a.m., Dr. Spector administered another injection of Demoral to Wey.

89. At 1:25 a.m., Wey was discharged from the hospital.

90. Wey's medical condition was stabilized at the time of the transfer.

91. Neither Mr. nor Mrs. Wey was ever presented with a form known as an Emergency Room Consent to Transfer to sign. As they were not presented with it, they neither refused nor consented to sign it.

92. The fact that the consent form on the authorization to transfer was left blank was unintentional, and represented a simple lack of communication between Dr. Spector and the nurse, Lydia Neitz, R.N.

93. Wey did not refuse to sign anything—specifically, he did not refuse to sign the Authorization to Transfer. Wey was not provided with any documentation at the hospital that he refused to sign, including but not limited to the Authorization to Transfer. Likewise, Mrs. Wey was shown no document or asked to sign no document which she refused to sign.

94. Wey was given a discharge instruction sheet which advised him to go directly to the VAMC and to keep his leg elevated; Wey signed this instruction sheet.

95. Wey was given his x-rays and an ice pack to take with him.

96. Wey was taken from the emergency room to his car, a 1980 Honda Prelude, in a wheelchair by Lydia Neitz, R.N. The car was brought to the door of the emergency room. The nurse assisted in tilting the car seat and placing the ice on Wey's ankle.

97. Wey was then driven to the VAMC by Mrs. Wey.

98. Neither Mr. nor Mrs. Wey told Dr. Spector that Wey wanted to go to the VAMC by ambulance.

99. Wey did not protest to Dr. Spector or to anyone else the fact that he was leaving the hospital.

100. Wey did not complain, did not show any signs of resentment or hostility, and did not react negatively when leaving the hospital and at the time of the transfer. Mrs. Wey did not complain when leaving the hospital and at the time of transfer.

101. Mrs. Wey did not verbalize to Dr. Spector that, if given a choice, she preferred to have her husband stay at the hospital or that she did not wish him transferred to the VAMC unless an ambulance was available.

102. Mrs. Wey did not have any discussion with anyone other than Dr. Spector relating to the decision to go to the VAMC or the method of transportation to be used.

103. Wey himself said nothing to Dr. Spector on the subject of whether and how to pay for an ambulance were one to be used. Wey testified that he was not involved in any discussion relative to an ambulance versus a private automobile.

104. Given his confusion and mental state at the time of the incident, Wey is not now able to reconstruct what Dr. Spector said relative to the transfer to the VAMC.

105. Dr. Spector was aware that Wey would be transported by Mrs. Wey by private car. Mrs. Wey expressed misgivings about transport by private car, but did not directly protest the mode of transport used.

106. Wey could not keep his leg elevated in the Honda Prelude, as directed by Dr. Spector, because of his height.

107. Mr. and Mrs. Wey arrived at the VAMC at approximately 3:05 a.m. on July 20, 1991.

108. About two hours after the second Demoral injection (which was given immediately prior to departure from the hospital), the Demoral began to wear off and Wey felt additional pain. This took place for about the last twenty minutes of the trip.

109. After arriving at the VAMC, Wey told Dr. Bali that he was HIV positive, had ITP, and had been on AZT and Dapsone under Dr. Plotkin's care. He was admitted to the VAMC as an inpatient.

110. Upon admission to the VAMC, Wey was given IVIG to stabilize his low blood platelet count, and was also given antibiotics.

111. On August 1, 1991, an open reduction and internal fixation of Wey's fracture was performed at the VAMC.

112. On August 5, 1991, Wey was discharged from the VAMC.

113. During the period from July 20, 1991 through his discharge, Wey received treatment at the VAMC for his ITP (low platelet count).

114. Surgery was not immediately performed at the VAMC; the surgery was delayed because, in Wey's word's "they wanted to make sure I had plenty of antibiotics and intravenous gammaglobulin to prevent any type of bleeding."

115. Before surgery at the VAMC, the physician wanted to stabilize Wey's HIV positive status and low platelet count.

116. The type of surgery performed on Wey is not typically performed on an expedient and immediate basis. In Wey's case, immediate surgery was unnecessary and medically unsound. The proper course was to consider and stabilize the underlying medical conditions.

117. During his treatment at the hospital, Wey received appropriate quality medical care and the emergency room physician, Dr. Spector, exercised appropriate medical judgment in the treatment that he gave Wey.

118. No material deterioration of Wey's medical condition occurred during or as a result of the transfer to the VAMC. Wey did not sustain any permanent injury or loss of function as a result of his transfer from the hospital or the mode of transportation, nor was the eventual surgery delayed as a result of the transfer to the VAMC.

119. Since his discharge from the VAMC in August 1991 and through the present, Wey has continued to receive treatment at the VAMC. He has also received treatment at Geisinger Medical Center.

120. Wey was readmitted to the VAMC in October 1991 because his platelets were at a questionable level and needed to be raised. During that admission, Wey again received IVIG treatment as well as physical therapy for his ankle.

121. Wey has also been seen on several occasions at the VAMC on an outpatient basis for treatment of his ankle, HIV/ITP problems, and drug and alcohol counselling.

122. Wey has also received IVIG therapy at Geisinger Medical Center in October of 1992.

123. The defendant hospital has the following policies and procedures:

(a) "Evangelical Community Hospital prohibits discrimination on the basis of race, color, creed, sex, national origin, age, veteran's status, marital status, or disability. This policy applies to practices, accommodations, and the opportunity for those associated with the Hospital to participate in programs or services."

Evangelical Community Hospital Patient's Guide.

(b) The Patient's Bill of Rights provides that

"when medically permissible, a patient may be transferred to another facility only after he or his next of kin or other legally responsible representative has received complete information and an explanation concerning the needs for and alternatives to such a transfer. The institution to which the patient is to be transferred must first have accepted the patient for transfer."

It also provides that "a patient has the right to full information and counseling on the availability of known financial resources for his health care"; and that "the patient has the right to expect good management techniques to be implemented within the hospital considering effective use of the time of the patient and to avoid the personal discomfort of the patient".

(c) The Hospital's Open Admission Policy is as follows:

It is the policy of the Hospital to admit and to treat all patients without regard to age, race, sex, color, religion, national origin, veteran's status, marital status, or disability. The same requirements for admission are applied to all; and patients are assigned within the Hospital without regard to age, race, sex, color, religion, national origin, veteran's status, marital status, or disability.

There is no distinction in eligibility for or in the manner of providing, any pa-

tient service provided by or through the Hospital. All facilities of the Hospital are available without distinction to all patients and visitors, regardless of age, race, sex, color, religion, national origin, veteran's status, marital status or disability.

All persons and organizations that have occasion either to refer patients for admission or recommend the Hospital are advised to do so without regard to the patient's age, race, sex, color, religion, national origin, veterans' status, marital status, or disability.

124. The hospital is required to complete a Hill–Burton Community Service Assurance Report every three years.

125. The most recent Hill–Burton Community Service Assurance Report was in 1991.

126. The services of physicians with medical staff privileges and service from each department of the hospital are available as needed to Medicaid patients.

127. The hospital did not deny emergency medical services to Wey.

128. The hospital does not have a policy or practice which results in the exclusion of any person with AIDS or HIV infection from receiving services at the hospital. Persons with HIV and AIDS have previously been admitted to the hospital.

129. Wey had been a patient in the emergency room at the hospital on five or six occasions prior to July of 1991 and had never been refused treatment or had his treatment limited in any fashion. On some of these visits, Wey had revealed his HIV status, but it did not affect the treatment he received on those occasions.

130. Any acute process for which Wey would be treated (whether it would be a dislocated ankle, appendicitis, or a medical illness of some sort) would have to be viewed and considered in the context of his medical history.

131. The VAMC was Wey's primary source of care. The staff at the VAMC was in the best position to know the intricacies of his past medical care and to manage any potential related problems that might arise.

132. Since Wey received IVIG during his July 20, 1991 hospitalization at the VAMC, his ITP was significant enough that bleeding problems were anticipated.

133. The ankle was properly stabilized with a splint and treated appropriately in the emergency room at the hospital.

134. No significant deterioration in Wey's condition or stability was likely to occur during his transfer to the VAMC by private vehicle, and none did occur.

135. Utilization of a private vehicle for transfer was reasonable and medically appropriate in the circumstances of this case.

136. ITP is a significant factor that any orthopaedic surgeon would have to consider carefully before surgery. Since he was being treated for his underlying condition at the VAMC, the decision to transfer Wey there was medically appropriate.

137. Even though the dislocation or subluxation had not been reduced, the patient was in stable medical condition and his transfer was in the patient's best interests.

138. There was no reason, given Wey's medical condition, why he could not be transferred by private vehicle.

139. The cost of an ambulance is not part of the normal hospital service.

140. Immediate surgery was unnecessary and it was in the best interest of the patient to be transferred to the VAMC so that his underlying medical condition could be monitored prior to surgery.

## III. CONCLUSIONS OF LAW

1. Plaintiff Christopher Wey has standing to bring suit under the Federal Anti–Dumping Act, which creates a private right of action to enforce the act and to sue for damages for "any individual who suffers personal harm as a direct result of a participating Hospital's violation of a requirement of [the Act]". 42 U.S.C. Section 1395dd(d)(2)(A).

2. Plaintiff has standing to bring suit under the Hill–Burton Act pursuant to 42

U.S.C. Section 300s–6 and its implementing regulations, 42 C.F.R. § 124.606(a)(4), which permit private individuals to bring suit to effectuate compliance with either the uncompensated care or the community service assurance imposed on Hill–Burton facilities under the Hill–Burton Act, 42 U.S.C. Section 291c(e).

3. Defendant is subject to both the Hill–Burton Act and the Federal Anti–Dumping Act.

4. Because the hospital stabilized the medical condition of plaintiff, there was no obligation on the part of the hospital to admit the plaintiff to the hospital. 42 U.S.C. Section 1395dd.

5. The hospital complied with all provisions and regulations of the Anti–Dumping Act. 42 U.S.C. Section 1395dd, *et seq.*

6. The hospital did not discriminate in its care of the plaintiff for any reason and, more specifically, the hospital did not discriminate against the plaintiff based upon his disability or method of payment.

7. The decision to transfer the plaintiff was not related to the economic status of plaintiff, the ability of plaintiff to pay the costs of the medical care, or any reason whatsoever related to his economic or financial condition or the existence or non-existence of applicable insurance.

8. The transfer of plaintiff to the VAMC was made in good faith and not for reasons related to the alleged reluctance or refusal of the hospital to treat a patient with HIV positive status or a patient with a certain financial status.

9. Dr. Spector's objective of providing continuity of medical care at the VAMC and the transfer to the VAMC was in the best interest of plaintiff.

10. The hospital, through its agents, servants and employees, provided plaintiff with an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, and also determined whether an emergency medical condition within the meaning of subsection (e)(1) of the § 1395dd existed, all pursuant to the provisions of § 1395dd(a) medical screening requirement.

11. The hospital, through its agents, servants and employees, once it determined that an emergency medical condition existed, provided necessary staff and facilities for such further medical examination and treatment as was required to stabilize plaintiff's medical condition, and then transferred him to another medical facility, all in accordance with the provisions of § 1395dd(b), "necessary stabilizing treatment for emergency medical conditions and labor".

12. The hospital, through its agents, servants and employees, made an "appropriate transfer" within the meaning of § 1395dd(c) in that the transferring hospital provided medical treatment within its capacity which minimized the risk to the plaintiff's health, and the receiving facility had available space and qualified personnel for the treatment of plaintiff, and had agreed to accept transfer of the individual and to provide appropriate medical treatment.

13. Before plaintiff was transferred from the hospital, he was "stabilized" within the meaning of § 42 U.S.C.S. § 1395dd(e)(3)(A), (B) in that he was given such emergency medical treatment as was necessary to assure, within reasonable medical probability, that no material deterioration of his condition was likely to result from or occur during his transfer from the facility, or with respect to the emergency medical condition from which he was allegedly suffering.

14. The hospital complied with all provisions and regulations of the Hill–Burton Act. 42 U.S.C. Section 291, *et seq.*

15. The hospital provided the necessary staff and facilities for the further medical examination and treatment of plaintiff to stabilize his medical condition, and the transfer of plaintiff to another medical facility was done in accordance with the provisions of the Hill–Burton Act.

16. The hospital was not required to provide an ambulance based upon the community service regulation of the Hill–Burton Act, at least in part because the hospital does not provide an ambulance service for any patient.

17. The community service regulations of the Hill–Burton Act do not require that a hospital provide free ambulance service to a patient being transferred, particularly when the hospital does not normally provide such ambulance service to any of its patients.

18. The community service regulations of the Hill–Burton Act do not require that a hospital inform a patient that it may be possible to locate an ambulance which will accept as payment the medical assistance reimbursement for which that patient may be eligible.

19. The document entitled "Patient's Bill of Rights" has no relevancy to this lawsuit since it imposes no additional obligations on the hospital not already encompassed within the Federal Anti–Dumping Act or the Hill–Burton Act, or their supporting regulations.

21. As the *Joint Commission for Accreditation of Health Care Organizations* is a voluntary organization, and the hospital is not a member, the *Joint Commission's Accreditation Manual for Hospitals* has no application or relevancy to these proceedings and the hospital is not bound by its provisions.

## IV. DISCUSSION

### A. RELEVANT STATUTES AND REGULATIONS

#### 1. The Anti–Dumping Act

Plaintiff's first claim is under the Federal Anti–Dumping Act, 42 U.S.C. § 1395dd. The relevant portions of the Anti–Dumping Act are as follows:

**§ 1395dd. Examination and treatment for emergency medical conditions and women in labor**

**(a) Medical screening requirement**

In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emer-

gency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

**(b) Necessary stabilizing treatment for emergency medical conditions and labor**

**(1) In general**

If any individual (whether or not eligible for benefits under this subchapter) comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

**(A)** within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

**(B)** for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

. . . . .

**(3) Refusal to consent to transfer**

A hospital is deemed to meet the requirement of paragraph (1) with respect to an individual if the hospital offers to transfer the individual to another medical facility in accordance with subsection (c) of this section and informs the individual (or a person acting on the individual's behalf) of the risks and benefits to the individual of such transfer, but the individual (or a person acting on the individual's behalf) refuses to consent to the transfer. The hospital shall take all reasonable steps to secure the individual's (or person's) written informed consent to refuse such transfer.

**(c) Restricting transfers until individual stabilized**

**(1) Rule**

If an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B) of this section), the hospital may not transfer the individual unless—

**(A)(i)** the individual (or a legally responsible person acting on the individu-

al's behalf) after being informed of the hospital's obligations under this section and of the risk of transfer, in writing requests transfer to another medical facility, [or]

(ii) a physician (within the meaning of section 1395x(r)(1) of this title) has signed a certification that based upon the information available at the time of transfer, the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer, . . . [and]

(B) the transfer is an appropriate transfer (within the meaning of paragraph (2)) to that facility.

A certification described in clause (ii) . . . of subparagraph (A) shall include a summary of the risks and benefits upon which the certification is based.

(2) Appropriate transfer

An appropriate transfer to a medical facility is a transfer—

.    .    .    .    .

(D) in which the transfer is effected through qualified personnel and transportation equipment, as required including the use of necessary and medically appropriate life support measures during the transfer; . . .

A private party has the right to bring an action under the Anti–Dumping Act, and a federal district court has jurisdiction over such claims. *Bryant v. Riddle Memorial Hospital*, 689 F.Supp. 490, 491–493 (E.D.Pa. 1988); 42 U.S.C. § 1395dd(d)(2)(A).

Plaintiff's claims under this Act are: (1) he was not given an opportunity to give informed consent to the transfer, since he was not requested to sign a consent to transfer form as required by § 1395dd(b)(3); and (2) the transfer was not appropriate under § 1395dd(c)(2)(D).

### 2. *Hill–Burton Act*

Plaintiff's second claim is under the Hospital Survey and Construction Act, also known as the Hill–Burton Act, 42 U.S.C. §§ 291 et seq., which is part of the Public Health Service Act, 42 U.S.C. §§ 201 et seq. The relevant provisions of the Hill–Burton Act are as follows:

### § 291c.  General regulations

The Surgeon General, with the approval of the Federal Hospital Council and the Secretary of Health and Human Services, shall by general regulations prescribe—

.    .    .    .    .

(e) State plan requirements; assurances necessary for approval of application

that the State plan shall provide for adequate hospitals, and other facilities for which aid under this part is available, for all persons residing in the State, and adequate hospitals (and such other facilities) to furnish needed services for persons unable to pay therefor. Such regulations may also require that before approval of an application for a project is recommended by a State agency to the Surgeon General for approval under this part, assurance shall be received by the State from the applicant that (1) the facility or portion thereof to be constructed or modernized will be made available to all persons residing in the territorial area of the applicant; and (2) there will be made available in the facility or portion thereof to be constructed or modernized a reasonable volume of services to persons unable to pay therefor, but an exception shall be made if such a requirement is not feasible from a financial viewpoint.

Under authority of § 291c(e), regulations were promulgated at 42 C.F.R. §§ 124.601 et seq., including the following:

**Provision of services.**

(a) *General.* (1) In order to comply with its community service assurance, a facility shall made the services provided in the facility or portion thereof constructed, modernized, or converted with Federal assistance . . . available to all persons residing . . . in the facility's service area without discrimination on the ground of race, color, national origin, creed, or any other

ground unrelated to an individual's need for the service or the availability of the needed service in the facility....

(b) *Emergency services.* (1) A facility may not deny emergency services to any person who resides ... in the facility's service area on the ground that the person is unable to pay for those services.

(2) A facility may discharge a person that has received emergency services, or may transfer the person to another facility able to provide necessary services, when the appropriate medical personnel determine that discharge or transfer will not subject the person to a substantial risk of deterioration in medical condition.

(c) *Third-party payor programs.* ... (2) The facility shall take any necessary steps to insure that admission to and services of the facility are available to beneficiaries of the governmental programs specified in paragraph (c)(1) [including the Pennsylvania Medical Assistance program, par. (c)(1)(i) ] of this section without discrimination or preference because they are beneficiaries of those programs.

(d) *Exclusionary admissions policies.* A facility is out of compliance with its community service assurance if it uses an admission policy that has the effect of excluding persons on a ground other than those permitted under paragraph (a) of this section....

█ A private party may bring an action, acting as a "private attorney general," to ensure a hospital's compliance with the Hill–Burton Act, but is limited to enforcing the hospital's assurances and may not seek personal relief. *White v. Moses Taylor Hospital,* 763 F.Supp. 776, 783 (M.D.Pa.1991).

### B. CLAIMS UNDER THE ANTI–DUMPING ACT

Plaintiff does not contest the fact that Dr. Spector provided an appropriate medical screening and determined that an emergency medical condition existed, § 1395dd(a), and that his condition was stabilized before he left the defendant hospital. § 1395dd(b)(1)(A). He argues, however, that he did not give informed consent to the transfer, and that the transfer was not done in an appropriate manner.

Plaintiff concedes that this is not an action for negligence or medical malpractice, nor could he maintain such an action, since the medical evidence indicates that the transfer did not aggravate his injuries or cause a material deterioration of his condition.

### *1. Informed Consent to Transfer*

█ Under the Anti–Dumping Act, when a patient with an emergency medical condition presents himself for treatment, the hospital must "treat or transfer"; that is, the hospital must either stabilize the condition *or* provide for the transfer of the patient. § 1395dd(b). Having stabilized plaintiff's condition, the hospital had fulfilled its responsibility under the Act.

Plaintiff contends, however, that the hospital never received informed consent prior to his transfer to VAMC.

Concerning the decision to transfer plaintiff, both plaintiff and his wife testified that they were unable to recall in detail their conversations with Dr. Spector because of the confusion and, at least for Mr. Wey, the pain. However, Mr. Wey testified that he knew that the reason for the transfer was to put him under the care of his personal physician, and that he knew that this was a wise decision. Dr. Spector testified that he discussed the reasons for the transfer with plaintiff and his wife, and pointed out their options. He indicated that, while plaintiff did not specifically agree to the transfer, plaintiff did indicate that he felt comfortable at VAMC. Plaintiff testified that, when he refused the second attempt at reduction of the dislocation, he wanted it done at VAMC.

At trial, plaintiff contended that the failure to have him sign a consent-to-transfer form left the hospital in non-compliance with the Anti–Dumping Act. However, the Act states that "[t]he hospital shall take all *reasonable* steps to secure" written consent. § 1395dd(b)(3) (emphasis added). The evidence indicated that the failure to have plaintiff sign the consent form was a simple misunderstanding between Dr. Spector and the

emergency room nurse. We see nothing in this event which is unreasonable.

Based upon the foregoing, it is clear that plaintiff knew of the reasons for the transfer and was informed of the risks and benefits. His claim that he was never part of the decision is not supported by the evidence: He cannot recall the conversation, yet he knew of the reasons for the transfer; no objection was ever voiced; and plaintiff and his wife made remarks, such as asking about the cost of ambulance transport and feeling comfortable with VAMC, which indicated that they agreed to the transfer. Therefore, although defendant had already fulfilled its responsibilities under § 1395dd(b), assuming that informed consent to refuse transfer were still required, defendant again fulfilled its responsibilities.

### 2. *Appropriate Transfer*

■ Plaintiff next contends that, even if the fact of his transfer did not violate the Anti–Dumping Act, the manner of his transfer was not appropriate under the Act. The relevant portion of the Act states that, to be appropriate, the transfer must be "effected through qualified personnel and transportation equipment, *as required* including the use of *necessary* and medically appropriate life support measures during the transfer." § 1395dd(c)(2)(D) (emphasis added).

The only expert opinions offered at trial indicated that transfer by private vehicle was medically appropriate. This indicates that the use of an ambulance was neither "required" nor "necessary." Therefore, the manner of transfer did not violate of the Anti–Dumping Act.

Plaintiff contends, however, that, had he been a paying patient, he would not have been sent by private car. The problem with this contention is that the hospital did not have control over the means by which plaintiff was transferred. The hospital does not own nor does it operate an ambulance. Transfer by ambulance is not a "service" provided by the hospital. The best that can be said is that, if a patient expresses a preference, the hospital will inform the "911" dispatcher of that preference. Even so, the ambulance which arrives at the hospital may

not be the one requested. It cannot be said, then, that summoning a particular ambulance company is a service provided by the hospital, so that denial of any such service cannot be said to be a violation of the Anti–Dumping Act.

### C. CLAIMS UNDER THE HILL–BURTON ACT

■ Plaintiff repeats the latter argument in contending that the hospital violated the Hill–Burton Act by failing to provide him with an ambulance which accepts Medical Assistance for payment.

As discussed above, the provision of an ambulance is not a service of the hospital. Nor is the provision of a specific ambulance company requested by a patient. The hospital has no control over what ambulance company is sent by the dispatcher.

Plaintiff argues, however, that the hospital should educate and train its personnel to seek an ambulance company which accepts Medical Assistance when that is the method by which a patient intends to pay for services. Plaintiff supports this argument by contending that the duty imposed upon hospitals under the Hill–Burton Act is an affirmative duty; that is, the hospital must take affirmative steps to ensure that its services are provided to Medical Assistance patients as well as paying patients, and that Hill–Burton is not satisfied with simply not denying requested services.

While it may be that requesting an ambulance company which accepts Medical Assistance would be a simple task, the fact is that requesting a particular company is not a service of the defendant hospital. The Hill–Burton Act may require that hospitals ensure that all services are provided equally to all patients, regardless of the method of payment, but the Act does not require that hospitals *create* services that a court may deem wise.

Finally, plaintiff analogizes the provision of a specific ambulance with the provision of the services of physicians' services. The problem with this analogy is that, while the regulations of the Department of Health and Human Services require that hospitals make the

acceptance of patients with Medical Assistance a condition of staff privileges for a physician, no such regulations exist for ambulance companies as a condition of transferring patients. Creation of such a. requirement is more properly the realm of the Department, and not this court.

### D. CONCLUSION

Defendant Evangelical Community Hospital fulfilled its burden under the Anti–Dumping Act when it stabilized the condition of plaintiff. Assuming that the transfer involved further responsibilities under the Anti–Dumping Act, the transfer was done in a medically appropriate manner, and provision of an ambulance was not "required" or "necessary"; at best, it might have been more comfortable. Plaintiff knew of the reasons for the transfer and did not object; in fact, his conduct manifested assent. He cannot now claim that he was denied the right to informed consent to refuse the transfer.

Plaintiff was not denied a service of the facility by the failure to summon an ambulance from a particular company, since the hospital does not provide such a "service."

For these reasons, judgment shall be granted in favor of defendant and against plaintiff.